## TONGASS CONSERVATION SOCIETY, et al.

### v.

### Richard B. CHENEY in his Official Capacity as Secretary of Defense of the United States, et al.

### No. 90–5106.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 10, 1991.

Decided Feb. 8, 1991.

---

Edward Lee Rogers, Washington, D.C., for appellants.

Jonathan B. Wiener, Atty., Dept. of Justice, with whom Richard B. Stewart, Asst. Atty. Gen., J. Carol Williams and Ellen J. Durkee, Attys., Dept. of Justice, were on the brief, for appellees.

Before WALD, RUTH BADER GINSBURG and THOMAS, Circuit Judges.

Opinion for the Court filed by Circuit Judge RUTH BADER GINSBURG.

RUTH BADER GINSBURG, Circuit Judge:

Tongass Conservation Society and other citizen groups (in this opinion, collectively called "the Society") contest under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, the adequacy of an Environmental Impact Statement ("EIS") that the Navy prepared for the Southeast Alaska Acoustic Measurement Facility ("SEAFAC"), the Navy's planned submarine testing range in Behm Canal, near Ketchikan, Alaska. The district court denied the Society's requests for injunctive relief and entered final judgment for the Navy. *Tongass Conservation Soc'y v. Cheney*, No. 89–2063 (D.D.C. Nov. 9, 1989). On appeal to this court, the Society presents two issues: first, did the Navy adequately evaluate "alternatives to the proposed action," *see* 42 U.S.C. § 4332(2)(C)(iii), when it claimed that no other site was a reasonable alternative to the site it selected; and second, did the Navy adequately evaluate SEAFAC's im-

pact on the local tourist industry? Satisfied that the EIS is adequate in both respects, we affirm the district court's judgment.

### I.

Submarines, to be effective, must remain undetected. Because submarines can be detected through the sound they emit, the Navy designs its submarines to be as quiet as possible. According to the Navy, the new Trident submarines are about one million times quieter than the early nuclear-powered subs. *See* Declaration of Charles P. Henson, Joint Appendix ("J.A.") at 251. A key part of the Navy's pursuit of quietness is its "acoustic testing" program, by which it measures the "acoustic signature" of its submarines.

Acoustic testing of the new submarines requires a quiet environment, free from disturbances both natural and human-made. At the Navy's existing West Coast acoustic testing facilities—the Santa Cruz Acoustic Range Facility ("SCARF") near Santa Barbara, and Carr Inlet, near Tacoma—ambient noise has been increasing. In 1979, the Navy concluded that its new submarines could not be tested accurately and completely at those facilities. The search then began for a new location for acoustic testing.

The Navy commissioned a study, conducted by Tracor, Inc. ("Tracor Study"). This Study identified fourteen sites, located off the West Coast and in Hawaii and Alaska, that passed preliminary screening. Tracor's screening process was designed to select areas that were (*inter alia*) quiet, of sufficient size and water depth to allow submarine maneuvers, meteorologically favorable, relatively remote from other water traffic, and reasonably close to home ports. After more detailed study of the fourteen sites, the Navy eliminated twelve as unsuitable. Field tests at the thirteenth site, off the "Big Island" of Hawaii, indicated that ambient noise was too high and was likely to increase. Behm Canal, however, fit the Navy's requirements for acoustic testing. The Navy concluded that Behm Canal was the only site among those studied at which it could obtain "accurate measurements of the entire noise signature generated by the Trident class submarines." Brief for the Federal Appellees at 7.

The testing facility is to be located in the western arm of Behm Canal, a relatively pristine fjord extending about sixty miles from north to south and three miles from east to west. The "underway measurement site," testing the noise emitted by submarines making high-speed maneuvers, would be situated near the Canal's opening to the south, and would extend almost six miles in length and 500 yards in width. Measuring devices would be located underwater, deep enough to avoid interference with surface traffic. The "static measurement site," which would determine how much noise the submarine made when not in motion, would involve two barges and four surface mooring buoys. Shore facilities would be located on Back Island, toward the eastern side of this part of the Canal. Testing would be conducted around the clock, during about 10–15 five-day periods per year.

The Navy proposed various restrictions on navigation in order to protect its equipment and to minimize interference with its testing. Restricted Area 1, a circle 2000 yards in diameter, would be located at the center of the underway testing site; in this area, vessels would be prohibited from anchoring, towing a drag, using a net, or dumping. Restricted Area 2 would also be a circle 2000 yards in diameter, located at the center of the static measurement site, with the same restrictions as Area 1, and with one additional restriction: vessels would be prohibited from mooring or tying up to, or "loitering" near, the floating barges or buoys. Restricted Area 3 would be a larger triangle surrounding Areas 1 and 2, and touching Back Island at one vertex. In this area, anchoring, towing a drag within 100 feet of the bottom, and dumping would be prohibited. Restricted Area 4 would be a strip about a mile long and 500 yards wide, running along the power and communications cables that would link the Canal's shore to Back Island, and along about half the shore of the island.

In this area, anchoring, towing a drag on the bottom, and dumping would be prohibited.

In contrast to the rules governing Areas 1–4, which would be continuously in effect, the regulations governing Restricted Area 5 would apply only while the Navy was actually conducting testing operations. Area 5 would extend approximately nine miles north and south, surrounding both testing facilities and encompassing Areas 1–3 and part of Area 4. At one point, Area 5 stretches across the entire width of the Canal. During testing operations, vessels could not pass through Area 5, except that small craft could proceed at a speed of five knots or less within 500 feet of the shore. Flashing beacons would indicate when passage is permissible; pilots could either radio ahead to determine when they could pass through Area 5, or wait a maximum of 15–20 minutes for operations to be completed. A "Submarine Operation Zone" would exist within Area 5 in waters above the underway measurement site. During testing, passage through these waters would be by prior permission only.

In May 1986, the Navy held a "public briefing" in nearby Ketchikan to "explain the Navy's interest in Behm Canal and to solicit public comments." Brief for the Federal Appellees at 11 n. 12. Just over a year later, the Navy distributed its draft EIS to more than 250 individuals and groups, and conducted a public hearing in Ketchikan. The Navy also received a number of written comments. In March 1988, the Navy issued the final EIS ("FEIS"). Responding to criticism that the FEIS did not explain why Behm Canal was the only feasible site for the testing facility, the Navy issued an Addendum in February 1989. After receipt of public comment on the Addendum, the Navy issued its final decision in April 1989. As a result of pub-

lic comment and negotiation with the state of Alaska, the Navy ultimately modified some elements of its original plan: it moved the shore and static measurement facilities so that they would not be visible from a campground and scenic area; it agreed to provide advance public notice of testing; it agreed not to conduct operations during special events or holidays; and it agreed to limit testing during the peak tourist and fishing period of May 1 through September 15.

Various citizen groups filed suit, contesting the Navy's compliance with NEPA. The district court denied the groups' motions for preliminary and final injunctions, and entered judgment for the Navy.[1]

## II.

■ A court reviewing the NEPA adequacy of an EIS may not substitute its own policy judgments for those of the agency. Its task, rather, is to "ensure that the statement contains sufficient discussion of the relevant issues and opposing viewpoints to enable the decisionmaker to take a 'hard look' at environmental factors, and to make a reasoned decision." *Natural Resources Defense Council, Inc. v. Hodel*, 865 F.2d 288, 294 (D.C.Cir.1988). NEPA provides that the "detailed statement" called an EIS must address, *inter alia*, "alternatives to the proposed action." 42 U.S.C. § 4332(2)(C)(iii). The court must evaluate the adequacy of an EIS discussion of alternatives according to a "rule of reason," which governs both "*which* alternatives the agency must discuss" and "the *extent* to which it must discuss them." *Natural Resources Defense Council, Inc. v. Hodel*, 865 F.2d at 294.

The implementing regulation issued by the Council on Environmental Quality ("CEQ") provides that the EIS must

---

1. The district court ruled that the original FEIS violated NEPA by failing to explain adequately why Behm Canal was the only feasible site. The court also held, however, that the subsequently prepared Addendum addressed this issue in sufficient detail, thus satisfying the purposes of NEPA. Therefore, following *Friends of the River v. FERC*, 720 F.2d 93, 106–08 (D.C.Cir. 1983), the district court did not order a remand.

*Tongass Conservation Soc'y v. Cheney*, No. 89–2063, slip op. at 24 (D.D.C. Nov. 9, 1989).

On this appeal, we need not determine whether the original FEIS, standing alone, would satisfy NEPA: in both briefs filed in this court and at oral argument, the Society has conceded that the Addendum is part of the EIS for purposes of our review.

"[r]igorously explore and objectively evaluate *all reasonable alternatives*, and for alternatives which were eliminated from detailed study, *briefly discuss* the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a) (1989) (emphasis added). The Navy contends that because Behm Canal was the only feasible site, there was no reasonable alternative to evaluate; hence the EIS need only have briefly discussed why the other preliminarily-screened sites were not reasonable alternatives. According to the Navy, the brief discussion required by the CEQ regulation was adequately supplied by explanation in the body of the FEIS, together with the more substantial analysis in the Addendum and the study it incorporates by reference.

The Society raises two objections to the Navy's treatment of "alternatives to the proposed action." *See* 42 U.S.C. § 4332(2)(C)(iii). First, according to the Society, some of the fourteen sites that passed the preliminary screening were reasonable alternatives to Behm Canal, and therefore the Navy should have conducted comparative environmental studies of those sites. As support for this claim, the Society cites selected passages from Navy-commissioned studies that refer favorably to certain characteristics of SCARF, a Navy testing facility near Santa Barbara, and BARSTUR, a similar facility off the coast of Kauai in the Hawaiian Islands. In its reply brief and at oral argument, the Society emphasized, particularly, a portion of a sentence in the Tracor Study that reads: "BARSTUR and SCARF ... are capable of accommodating high speed Trident radiated noise trials." Reply Brief for Appellants at 9.

The same page of the Study, however, strongly qualifies this appraisal of SCARF and BARSTUR. Adding to the quoted sentence the three words that the Society replaced with an ellipsis, the Study reports

that BARSTUR and SCARF are "capable of accommodating" such acoustic testing *"when properly instrumented"* (emphasis added). This very page indicates that neither facility can be "properly instrumented" in this sense. Just above the quotation, the Study states that "[n]o currently operable Pacific Area Acoustic measurement facility possesses the full range of site capabilities necessary to acquire Trident Radiated Acoustic Data *using traditional methods"* (emphasis added); just below the sentence that the Society quotes, the Study observes that *"non-traditional methods"* are not "competitive with traditional measurement regimes" (emphasis added). The import of the full passage from which the Society quotes appears to be this: no currently feasible methods, traditional or non-traditional, will adequately equip SCARF or BARSTUR to measure Trident-class submarines with the accuracy sought by the Navy. Nor do we find persuasive the Society's other attempts to impeach the Navy by selectively quoting from Navy-commissioned studies.[2]

The Society argues, in the alternative, that even if the Navy's studies do not directly indicate that other sites were reasonable alternatives, still the Navy offered a defective justification for asserting that other sites were not viable choices. According to the Society, both means that the Navy employed to justify its decision are inadequate. On one hand, the Society contends, the nontechnical parts of the FEIS simply string out a series of "conclusory" assertions. On the other, the Society claims, the technical portions are unintelligible and in any event fail to support the conclusory assertions.

The relevant CEQ regulations provide that an agency need only "briefly discuss the reasons" why rejected possibilities were not "reasonable alternatives," 40 C.F.R. § 1502.14(a), and that such a brief

---

**2.** The Society also relies upon (1) isolated passages from a study of SCARF carried out by Delco Electronics—the company that "designed, funded, built, and operate[s]" that testing range —(2) a study of BARSTUR that praises its navigational and meteorological conditions, and (3) a study of the undeveloped site near the "Big Island" of Hawaii that ranked it with Behm Canal as a prima facie candidate. The last item is the most nearly persuasive. However, as the report indicates, the Navy discovered in its site visit that surf, wind, and human-generated noise made the site accoustically unsuitable.

discussion—like any part of the main text of an EIS—"shall be written in plain language ... so that decisionmakers and the public can readily understand them." *Id.* § 1502.8. The main text of an EIS must disclose information in terms intelligible to "interested members of the public, public servants, and legislators." *Natural Resources Defense Council, Inc. v. United States Nuclear Regulatory Comm'n,* 685 F.2d 459, 487 n. 149 (D.C.Cir.1982), *rev'd on other grounds sub nom. Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983). "Overly technical matter and supporting data, however, should ordinarily appear in appendices." *Oregon Environmental Council v. Kunzman,* 817 F.2d 484, 494 (9th Cir. 1987).

■ The Addendum to the FEIS fulfills these requirements. The main text of the Addendum states the criteria and procedures by which the Navy screened five existing testing facilities and nine undeveloped sites, describing the relevant characteristics of each facility in separate paragraphs. The text continues by explaining the conclusions and recommendations of this screening, referring the technically more hardy reader to the Tracor Study. The Addendum additionally describes the field studies that eliminated the "Big Island" of Hawaii site from contention; it analyzes Behm Canal's suitability; and it reviews the process that led to SEAFAC's location in the particular part of Behm Canal designated for the testing facility. This account, we are satisfied, suffices as a nontechnical "brief discussion" of the reasons for considering only Behm Canal a feasible site.

■ The Society further argues that the Navy violated NEPA by treating inadequately the technical reasoning supportive of the Behm Canal siting decision. The Addendum twice refers generally to the Tracor Study's technical discussion. According to the Society, by failing to refer to particular portions of the Tracor Study, the Navy violated 40 C.F.R. § 1502.24, which provides that an agency "shall identify any methodologies used and shall make *explicit reference* by footnote to the scientific and other sources relied upon for conclusions in the statement." (Emphasis added.) We do not read the term "explicit reference" in § 1502.24 to require pinpoint citations, when an agency is explaining only why it decided that certain preliminarily-identified sites were not reasonable alternatives.[3] The discussion in the Addendum and the Tracor Study, in sum, suffices as a "brief discussion" of why the Navy decided that there were no reasonable alternatives to the Behm Canal site.

### III.

■ The Society argues, finally, that the FEIS inadequately considers SEAFAC's impact on the region's ability to "market itself as a wilderness experience." The Society relies on a CEQ regulation that provides:

> [E]conomic and social effects are not intended by themselves to require preparation of an environmental impact statement. When an environmental impact statement is prepared and economic or social and natural or physical environmental effects are interrelated, then the environmental impact statement will discuss all of these effects on the human environment.

40 C.F.R. § 1508.14 (1989). According to the Society, the Navy provided only a cursory, one-paragraph analysis of SEAFAC's socioeconomic effects. The paragraph selected by the Society reads:

> Because the area markets itself as a place to "get away from it all," the presence of a nuclear submarine testing facility may result in difficulties in marketing or in securing repeat business. The impact of this factor on the charter and

---

**3.** The Society argues further that the Navy could not reasonably have relied upon the Tracor Study, since (according to the Society) that Study does not support its conclusions. As noted above, we do not find this argument persuasive. *See supra* p. 1141.

lodge business is probably negative but unknown in size.

FEIS at 5.15, *reprinted in* J.A. at 93.

The Society incorrectly charges that only one paragraph of the FEIS evaluates SEAFAC's effects upon the local sport fishing and tourist industry. The main body of the FEIS first describes existing fishing and tourism patterns in the area, *see* FEIS at 4.19–4.27, J.A. at 73–81, and then assesses the impact that SEAFAC would have on the tourist economy of an area that markets itself as a "wilderness experience." *See* FEIS at 5.13–5.16, J.A. at 91–94. The Navy noted public comment indicating that "the presence of submarines may be viewed by users of the area as incompatible with the wilderness they expect," even if, as the FEIS suggests elsewhere, "the presence is not especially intrusive."[1] Generally, however, the Navy treated SEAFAC's socioeconomic impact as "governed by the navigational access and safety restrictions" that it had proposed. *See supra* pp. 1139–1140. The FEIS analyzes the effect that each restriction would have upon the kind of fishing generally found in that area, and concludes that the adverse impact of Restricted Areas 1–4 would be minimal. FEIS at 5.14–5.15, J.A. at 92–93.

As for Restricted Area 5—the large area of the Canal in which vessel transiting would be restricted during testing—the FEIS frankly acknowledges that fishing and tourism would be affected more severely. As the Navy noted, "[f]ishing time and the time spent in finding fish is extremely important to the 4–hour charter operators." The Navy further allowed that charter operators might have to forego fishing opportunities during testing, and that the eastern shore of this part of the Canal might be overcrowded. Moreover, the FEIS warns, rental business might be

adversely affected. FEIS at 5.15, J.A. at 93. In turn, the Navy concluded, the potential effects on fishing could cause losses for the marinas and lodges and impair efforts to "market" the area as an unspoiled wilderness. *Id.* The Navy, however, pointed to its agreement to schedule testing around peak sport and commercial fishing periods and to notify the public of testing in advance. These considerations, together with the fact that numerous popular fishing areas in the vicinity would not be affected by navigational restrictions, would tend to mitigate untoward effects. FEIS at 5.14–5.15, J.A. at 92–93.[5]

The district court found that the Navy's discussion of SEAFAC's socioeconomic impacts did not rest on "perfunctory references ... [not] useful to a decisionmaker in deciding whether, or how, to alter the program to lessen cumulative environmental impacts." *Tongass Conservation Soc'y,* slip op. at 13 (quoting *Natural Resources Defense Council, Inc. v. Hodel,* 865 F.2d at 299). That court noted the measures the Navy had taken, in response to public comment on the draft EIS, to mitigate SEAFAC's effects on fishing and tourism. *See supra* p. 1140. The district court ultimately concluded that "the agency has adequately considered and disclosed the environmental impact of its actions and ... its decision is not arbitrary or capricious." *Tongass Conservation Soc'y,* slip op. at 15–16 (quoting *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 97–98, 103 S.Ct. 2246, 2252–53, 76 L.Ed.2d 437 (1983)).

Challenging this conclusion, the Society argues that the Navy was obliged to undertake a "survey conducted over several months, perhaps during two different seasons, of visitors, tourists and others travelling to the area for recreational fishing or

---

**4.** The Navy discussed the attempts it had made to make the shore facilities "blend in with the existing environment." FEIS at 5.17, J.A. at 95. The buoys and barges at the static measurement site, the FEIS stated, "would be barely visible at a distance of [six] nautical miles," and were in any event "common sights" in an area "highly dependent on fishing and marine transportation." *Id.*

**5.** The public comments published and indexed with the FEIS, together with the Navy's response, provide additional information concerning the possible effects of SEAFAC on the fishing and tourist industry. These comments and responses are "integral parts" of the FEIS. *Sierra Club v. Adams,* 578 F.2d 389, 394 (D.C.Cir. 1978).

other activities, coupled with baseline data on existing conditions." A survey of this character, the Society claims, "would have easily and inexpensively provided data" on how seriously the area's self-marketing efforts would be impaired. Such a survey, according to the Society, is essential because various cases in "[t]his circuit and others have established that discussion of socioeconomic impacts in an EIS should be extensive."

We do not read the cases in point to require the comprehensive survey that the Society proposes. Relevant precedent establishes, rather, that an agency must make reasonable efforts to acquire relevant information concerning socioeconomic impacts, when "economic or social and natural or physical environmental effects are interrelated."[6] 40 C.F.R. § 1508.14. The survey that the Society requests would indeed be one means of gathering such information. But in view of the FEIS's discussion of SEAFAC's likely effects upon sport fishing, and the various steps the Navy has taken to accommodate its operations and testing schedule to the needs of the tourist industry, we cannot conclude that the Navy's refusal to conduct such a survey was unreasonable.[7]

CONCLUSION

We are satisfied (1) that the Addendum to the FEIS adequately justifies the Navy's position that there is no reasonable alternative to the Behm Canal site, and (2) that the FEIS adequately addresses SEAFAC's impact on the local tourist industry. The judgment of the district court is accordingly

*Affirmed.*

---

6. In *City of Rochester v. United States Postal Service,* 541 F.2d 967 (2d Cir.1976)—unlike the present case—the environmental assessment "wholly neglected consideration of" socioeconomic impacts. *Id.* at 973. In *Limerick Ecology Action, Inc. v. United States Nuclear Regulatory Comm'n,* 869 F.2d 719 (3d Cir.1989), the court held that it was not unreasonable for the NRC to consider only those socioeconomic consequences that would likely occur within one year after a severe nuclear accident. In *Committee for Auto Responsibility v. Solomon,* 603 F.2d 992 (D.C.Cir.1979), *cert. denied,* 445 U.S. 915, 100 S.Ct. 1274, 63 L.Ed.2d 599 (1980), this court ruled that "it is reasonable to assess parking and related problems—such as congestion and noise and air pollution—when [the federal building for which parking is provided] is subject to an EIS." *Id.* at 1002 n. 44. None of these cases suggests that the Navy's consideration of socioeconomic impacts was inadequate for failure to prepare the requested survey.

7. The Society hinted in its opening brief, and asserted at oral argument, that the Navy was required by CEQ regulation to find explicitly that the survey would have been too expensive to conduct, and to explain that finding. Under 40 C.F.R. § 1502.22(b) (1989), however, this obligation is triggered only if "there is incomplete or unavailable information." The Navy noted in its April 1989 Record of Decision that it had "collected and analyzed a substantial amount of data regarding the socioeconomic environment of the area and the potential adverse effects on that environment.... These data are summarized extensively in the FEIS and no further studies are warranted in order to reach a reasoned choice among the alternatives presented." J.A. at 221. For reasons suggested in the text above, we cannot say that this conclusion is unreasonable.