846 F.2d 79
 269 U.S.App.D.C. 366, 46 Ed. Law Rep. 913,
18 Envtl. L. Rep. 20,857
 SAFE BUILDINGS ALLIANCE, Petitioner,
v.
ENVIRONMENTAL PROTECTION AGENCY, Respondent,
NSBA, Barnwell School District No. 45, American Association
of School Administrators, GAF Corp., Attorney Generals of
Various States, Corporation Council of D.C., American
Federation of State, County and Municipal Employees, et al.,
Intervenors.
NATIONAL GYPSUM COMPANY, Petitioner,
v.
ENVIRONMENTAL PROTECTION AGENCY, Respondent,
NSBA, Barnwell School District No. 45, American Association
of School Administrators, Intervenors.
UNITED STATES GYPSUM COMPANY, Petitioner,
v.
U.S. ENVIRONMENTAL PROTECTION AGENCY, Respondent.
Mirrer Yeshiva K'TANAH and Bernard Fryshman, PhD., Petitioners,
v.
U.S. ENVIRONMENTAL PROTECTION AGENCY, Respondent.
John F. WELCH, individually and as parent and next friend of
John W. Welch, Jr. and Daniel J. Welch, Petitioner,
v.
ENVIRONMENTAL PROTECTION AGENCY, Respondent,
NSBA, Barnwell School District No. 45, American Assoc. of
School Administrators, Intervenors.
 Nos. 87-1669, 87-1670, 87-1676, 88-1015 and 88-1016.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued March 31, 1988.
Decided May 10, 1988.
 
 Edward W. Warren, with whom L. Mark Wine, Timothy S. Hardy, John Gibson Mullan, Lawrence T. Hoyle, Sr., William H. Lewis, Jr. and Thomas R. Bartman, Washington, D.C., were on the joint brief, for petitioners. James W. Moorman, Washington, D.C., also entered an appearance for petitioner Nat. Gypsum Co. Robert J. Aamoth, Washington, D.C., also entered an appearance for petitioner Mirrer Yeshiva K'Tanah and Bernard Fryshman, Ph.D.
 Mary Elizabeth Ward, Atty., Dept. of Justice, with whom Roger J. Marzulla, Acting Asst. Atty. Gen., and Alan H. Carpien, Atty. E.P.A., Washington, D.C., were on the brief, for respondent.
 
 
 1
 Daniel Guttman, with whom Scott H. Strauss for Citizens intervenors, Darci L. Rock, Washington, D.C., for Nat. School Boards Ass'n, et al., Donna L. Dagnall, Thomas Mark Schmidt, Springfield, Ill., for State Attys. Gen. and August W. Steinhilber, Washington, D.C., for Nat. School Boards Ass'n were on the joint brief, for intervenors Citizen Intervenors, et al. William A. Anderson, Washington, D.C., also entered an appearance for intervenors Nat. School Boards Ass'n, et al.
 
 
 2
 Patrick M. Raher and David F. Grady, Washington, D.C., were on the brief for intervenor American Ass'n of School Administrators.
 
 
 3
 Michael A. Wiegard and Paul A. Zevnik, Washington, D.C., were on the brief for intervenor GAF Corp.
 
 
 4
 Frederick D. Cooke, Jr., Washington, D.C., entered an appearance for intervenor Corp. Counsel of D.C., et al.
 
 
 5
 Before EDWARDS and WILLIAMS, Circuit Judges, and OBERDORFER,* District Judge.
 
 
 6
 Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.
 
 HARRY T. EDWARDS, Circuit Judge:
 
 7
 Since 1979, the Environmental Protection Agency ("EPA") has provided technical assistance to elementary and secondary school officials in identifying and controlling asbestos in school buildings. Although EPA required that school buildings be inspected for asbestos-containing material ("ACM") and that the results of those inspections be reported to school officials and parents, it supplied only imprecise, nonbinding advice concerning the repair or removal of ACM. EPA also declined to say what ambient concentrations of asbestos posed a danger to the health of students, teachers, administrators and maintenance workers. As a result, some school officials did nothing, perhaps endangering the health of school building occupants. Others harkened to the self-interested advice of newly created asbestos removal firms and ordered removal of all ACM. Those removals were sometimes unnecessary, at times even detrimental, since slipshod work may increase ambient concentrations of asbestos.
 
 
 8
 Congress enacted the Asbestos Hazard Emergency Response Act of 1986 ("AHERA"), Pub.L. No. 99-519, 100 Stat. 2970 (codified at 15 U.S.C. Secs. 2641-2654 (Supp. IV 1986)), in an attempt to right this highly confused and potentially dangerous state of affairs. Bemoaning "the lack of regulatory guidance" from EPA, 15 U.S.C. Sec. 2641(a)(1), Congress commanded the agency to issue regulations within 360 days covering school inspections, the accreditation of inspectors and management planners, and the determination and implementation of appropriate response actions. 15 U.S.C. Sec. 2643(a).
 
 
 9
 EPA promulgated regulations prior to the statutory deadline.[1] The petitioners in this case, former manufacturers of ACM, contend that these regulations fail in several ways to fulfill AHERA's mandate. For reasons stated herein, we deny their petitions for review.
 
 I. BACKGROUND
 
 10
 AHERA is an admittedly hasty response to a widespread and pressing problem. Given the nature of the assignment, there was no way for EPA to achieve absolute precision in regulations dealing with asbestos hazards. Indeed, the statute does not even appear to contemplate regulatory precision. It requires EPA to "promulgate regulations describing a response action in a school building under the authority of a local educational agency, using the least burdensome methods which protect human health and the environment." 15 U.S.C. Sec. 2643(d)(1). At first blush, this crucial provision appears to demand nothing more than a list of appropriate responses to ACM in various circumstances. Moreover, AHERA contains incorporating references to EPA's existing guidelines, which merely describe different possible responses, see 15 U.S.C. Sec. 2643(d)(2)-(5), and only requires that local educational agencies, not EPA itself, develop asbestos management plans for buildings under their control. See 15 U.S.C. Sec. 2643(i)(1).
 
 
 11
 Other aspects of the statute, however, suggest that more specific advice is required. The legislative "findings" in AHERA openly criticize EPA for offering inadequate guidance. See 15 U.S.C. Sec. 2641(a). Moreover, AHERA states explicitly that, "[i]n determining the least burdensome methods, the Administrator shall take into account local circumstances, including occupancy and use patterns within the school building and short- and long-term costs." 15 U.S.C. Sec. 2643(d)(1). How EPA is to make such determinations and how specific they are to be, given that AHERA covers over 30,000 schools across the country in divergent circumstances, Congress neglected to say.
 
 
 12
 Complicating EPA's job further is the uncertainty concerning the dangers of exposure to low levels of asbestos. Senator Stafford, one of AHERA's chief sponsors, noted that "[t]he American Cancer Society, reflecting prevailing scientific opinion, testified that there is no known safe level of asbestos exposure and that efforts should be made to avoid even low-level exposure." 132 CONG.REC. at S15,064 (daily ed. Oct. 3, 1986). He went on to emphasize that AHERA only requires EPA to identify response actions that are sufficient to protect human health; it need not prove that a particular response action is absolutely necessary to protect human health. Id. at S15,066. "Doubt," he said, "should be resolved in favor of affording greater protection." Id. Senator Stafford further emphasized that EPA need not establish a quantitative measure of safety before it permitted or required certain response actions. See id. at S15,066; Joint Explanatory Statement, id. at S15,065.[2]
 
 
 13
 Given Congress' awareness of the dearth of precise information about the hazards of exposure to asbestos, the tight timetable it imposed on EPA, its requirement that EPA conduct further studies to ascertain "whether there is a need to establish standards for, and regulate asbestos exposure in, public and commercial buildings," 15 U.S.C. Sec. 2653; see 15 U.S.C. Sec. 2641(b)(3), and its short-term focus on the sufficiency rather than the necessity of certain response actions to protect human health, AHERA was plainly intended as the framework for an evolving administrative response to the perils posed by ACM in schools. Congress impelled EPA to act quickly to address existing hazards. In doing so, it accorded EPA considerable leeway in determining adequate methods of dealing with extant problems. Congress expected EPA to improve on the guidelines it had hitherto offered to school officials, but it did not--because it could not--say exactly how fast or how far EPA should go in rendering its counsel more precise. Congress contemplated, however, that EPA would refine its initial regulatory approaches over time, as more information about the dangers of asbestos became available, as the relative merits of different abatement techniques became known, and as the costs of various responses became clearer. See Joint Explanatory Statement, 132 CONG.REC. at S15,065. It is against the backcloth of this legislative design that we must assess the petitioners' objections to EPA's attempt to embody AHERA's aims in detailed regulations.
 
 II. ANALYSIS
 
 14
 A. EPA's Alleged Failure to Define The Least Burdensome Response Action
 
 
 15
 The petitioners fault EPA for failing to specify a single least burdensome response action in the various situations described in 15 U.S.C. Sec. 2643(d)(2)-(5). In addition, they contend that EPA abdicated its responsibility by leaving it to school officials to ascertain the least burdensome abatement methods in the unique circumstances of their schools, following their receipt of reports from accredited inspectors and management planners.
 
 
 16
 We reject these contentions. Indeed, it is highly ironic that industry representatives assail EPA for supplying inadequate guidance to school officials when their counsel have assured us that those officials are now thoroughly satisfied with the regulatory guidance provided by EPA. Confronted by the Sisyphean task of reconciling Congress' general demand that it describe "a response action ... using the least burdensome methods which protect human health and the environment," 15 U.S.C. Sec. 2643(d)(1), with Congress' injunction to "take into account local circumstances, including occupancy and use patterns within the school building and short- and long-term costs" in over 30,000 cases, id., EPA reasonably concluded that some compromises were necessary. In the preamble to its final rule, EPA stated that "a rigid response action decision structure is not appropriate for this rule, primarily because many asbestos hazard situations are too circumstantial and appropriate response actions are too 'hazard specific' to fit neatly into a discrete set of prescriptive categories." 52 Fed.Reg. at 41,838 (1987). Instead, EPA offered a list of specific responses that it adjudged sufficient to protect human health, along with a method by which school officials should be able to determine the least burdensome response in the buildings they supervise.
 
 
 17
 We find that EPA's regulations effect a reasonable, faithful interpretation of AHERA's somewhat contradictory commands.[3] As the petitioners concede, "Congress understood that EPA could not visit thousands of schools and write a specific plan for managing [ACM] in each one." Joint Brief for Petitioners at 22. What EPA could--and did--do was require that schools be searched for ACM by inspectors accredited in conformity with EPA regulations; that officials of schools containing ACM obtain a report detailing abatement options and recommendations by a management planner (also accredited in accordance with EPA regulations); that those officials, in formulating a management plan, choose from among the set of response actions found by EPA to be sufficient to protect human health and the environment; and that their plan be approved by the state governor, thereby assuring further oversight. This seems to us a careful, intelligent attempt to meet Congress' confusing demands. In light of the deference due EPA in these circumstances, we cannot but reject the petitioners' objection.
 
 
 18
 B. EPA's Failure to Establish Safe Levels of Asbestos Exposure
 
 
 19
 The petitioners argue that, even if EPA need only define response actions sufficient to protect human health and the environment in a variety of situations, it cannot do so without first determining what levels of asbestos exposure are safe. Yet, EPA has not pronounced any ambient concentrations safe or unsafe. Hence, they contend, EPA's regulations lack a rational basis, and must be set aside as arbitrary and capricious.
 
 
 20
 This argument is meritless. Congress explicitly recognized that experts presently disagree over what levels of exposure are safe. See 132 CONG.REC. at S15,064-66. Nevertheless, it stated that EPA's existing guidelines should serve as minimum standards in devising appropriate response actions. Congress nowhere said that EPA need rely exclusively or even mainly on air monitoring techniques in selecting response actions, or that it need establish a quantitative measure that it deems safe. Indeed, the legislative history affirmatively suggests an intent not to impose such requirements. See id.; see also 132 CONG.REC. at H8823 (daily ed. Oct. 1, 1986) (remarks of Representative Florio). Congress left these matters for EPA to decide, and commissioned further studies of the hazards of asbestos exposure. Congress envisioned growing precision in EPA's regulations over time, as more information becomes available, but it did not intend that EPA do nothing until scientific experts agreed on a quantitative measure of safety. Indeed, the petitioners' insistence that EPA construct a quantitative model before it do anything else offends common sense as well as congressional intent, for the potential hazards posed by presently undamaged ACM obviously could not be quantified or measured by air monitoring techniques. See 52 Fed.Reg. at 41,838 (1987) (defending EPA's recommendation of visual inspection as the primary monitoring technique).
 
 
 21
 It should also be borne in mind that EPA's regulations were framed against the backdrop of past proceedings to establish safe levels of asbestos. See 52 Fed.Reg. at 41,844. This is not a case where an agency, confronted by conflicting evidence, merely threw up its hands and declined to act. Rather, EPA conducted hearings in an attempt to determine the dangers associated with different concentrations of asbestos. Because Congress required it to define response actions that are sufficient to protect human health (erring on the side of caution), not to find the absolute minimum responses necessary to accomplish that end, EPA considered it unnecessary to resolve prevailing disagreements among scientific experts. Instead, it selected response actions that Congress and most experts deemed sufficient to protect those who study or work in school buildings. In view of the special deference owed to an agency's expert judgment on matters at the frontiers of science, see, e.g., Baltimore Gas & Elec. Co. v. NRDC, 462 U.S. 87, 103, 103 S.Ct. 2246, 2255, 76 L.Ed.2d 437 (1983); Public Citizen Health Research Group v. Tyson, 796 F.2d 1479, 1504-05 (D.C.Cir.1986), we can hardly brand EPA's failure to establish a safe level of exposure or to require the use of air monitoring arbitrary and capricious.
 
 
 22
 C. EPA's Decision to Permit Removal of ACM in All Cases
 
 
 23
 Section 763.90(a) of EPA's regulations reads in part: "Nothing in this section shall be construed to prohibit removal of [ACM] from a school building at any time, should removal be the preferred response action of the local education agency."The petitioners advance two objections to this provision. They argue, first, that EPA possesses no evidence showing that the removal of ACM is ever beneficial. The available evidence, they say, reveals that even properly conducted removals raise asbestos levels, and that EPA should therefore have forbidden removals. Joint Brief for Petitioners at 40-43. Second, they argue that, even if their first point is unsound, EPA should not have permitted removals when current asbestos levels are below the "clearance level" that must be attained whenever an abatement action is performed, id. at 43-44, or when they are not the least burdensome method of curing a school's asbestos problem. Brief of Intervenor GAF Corp. at 21 n. 15.
 
 
 24
 EPA considered and reasonably rejected the first of these arguments. See 52 Fed.Reg. at 41,844. It noted that studies showing increases in asbestos levels following removal were based on a small sample of cases, in at least some of which abatement actions were not done properly. EPA's regulations covering removal were intended to prevent this occurrence in the future. To the extent that the petitioners have a quarrel with EPA's regulations, their dissatisfaction should be directed at those provisions that were designed to preclude unsafe and incomplete removals, not at the clause permitting removals in circumstances where school officials consider removals prudent. The petitioners, however, have not challenged those provisions.
 
 
 25
 The conclusion that EPA acted properly in not banning removals appears inescapable in light of the fact that Congress apparently assumed that removal would always be an option. For example, Congress set as a minimum the response actions described in EPA's existing guidelines and those response actions include removal in almost every case. See 15 U.S.C. Sec. 2643(d)(2)-(5). Senators Stafford and Moynihan also mentioned removal as an option for local educational agencies. See 132 CONG.REC. at S15,066, S15,068. The petitioners' broadside attack on the permissibility of removal, based in part on studies involving removal techniques that are not now authorized and despite contrary indications in the legislative history, is unavailing.
 
 
 26
 The petitioners' second argument is patently mistaken. It may be the case that in some instances well-performed removal is merely innocuous rather than beneficial. But that fact, although a sound reason for school officials not to waste money on needless removals, is not an adequate reason for EPA to proscribe removals in some or all cases. The legislative history renders it abundantly clear that EPA, as Senator Baucus said, "should not discourage a school from going ahead and eliminating their long-term asbestos problem if school officials should decide that is the best course of action." 132 CONG.REC. at S15,067; see id. at S15,066 (remarks of Senator Stafford).[4] Moreover, Congress stated clearly that AHERA does not constrain school officials to use the least burdensome method found by EPA to be sufficient to protect human health and the environment. EPA's regulation permitting removal in all cases is thus fully in accord with congressional intent.[5]III. CONCLUSION
 
 
 27
 EPA's regulations defining least burdensome response actions, establishing a method by which management plans are to be formulated and implemented, and permitting removal of ACM if school officials so desire represent a reasonable interpretation of AHERA's less than pellucid demands. Accordingly, we deny the petitions for review.
 
 
 28
 So ordered.
 
 
 
 *
 Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. Sec. 292(a)
 
 
 [1]
 See 52 Fed.Reg. 41,826-98 (1987) (to be codified at 40 C.F.R. Secs. 763.80-.99)
 
 
 [2]
 Because the final version of AHERA resulted from informal negotiations between the House and Senate sponsors of different versions of the Act, no authoritative committee reports exist explaining AHERA's provisions. A common Statement was agreed upon and read to both the House and Senate in lieu thereof. Senator Stafford further stated, when introducing the bill, that his remarks and those of other Senators who were actively involved in negotiating the final version "will serve as legislative history for purposes of discerning the intent of the authors of the substitute bill." 132 CONG.REC. at S15,065 (daily ed. Oct. 3, 1986)
 
 
 [3]
 The rigid "time limits set by Congress indicate that a reviewing court should accord the [EPA] 'an extra dollop of deference.' " Puerto Rico Maritime Shipping Auth. v. Federal Maritime Comm'n, 678 F.2d 327, 336 (D.C.Cir.) (quoting Houston Lighting & Power Co. v. United States, 606 F.2d 1131, 1145 (D.C.Cir.1978), cert. denied, 444 U.S. 1073, 100 S.Ct. 1019, 62 L.Ed.2d 755 (1980)), cert. denied, 459 U.S. 906, 103 S.Ct. 210, 74 L.Ed.2d 167 (1982). We have done so in reviewing this case
 
 
 [4]
 In response to the argument that EPA's regulations might be read as biased in favor of removal as an appropriate response, Government counsel assured this court in oral argument that the regulations were intended to be--as on their face they are--neutral with respect to the advisability of removing ACM in some or all situations. It is on the understanding that the regulations are neutral on this point that we uphold them
 
 
 [5]
 The petitioners raise two minor objections to EPA's regulations, both of which we reject
 First, intervenor GAF Corporation contends that EPA has illicitly expanded AHERA's definition of "school building" by adding to it "[a]ny portico or covered exterior hallway or walkway" and "[a]ny exterior portion of a mechanical system used to condition interior space." Compare 15 U.S.C. Sec. 2642(13) with 40 C.F.R. Sec. 763.83. We find sufficient EPA's explanation that "these exterior areas, by virtue of the accessibility of the ACM found there, warrant inclusion under the rule." 52 Fed.Reg. at 41,829. EPA's additions only make explicit what is implicit in AHERA's definition of "school building" and help to effectuate Congress' aims.
 Second, the American Association of School Administrators ("AASA") argues that EPA, in following AHERA's own timetable, set unreasonably short deadlines for the submission of management plans, that it could have and should have extended those deadlines, and that its failure to do so constitutes arbitrary and capricious agency action. This argument is baseless. Not only does AHERA impose mandatory deadlines, which EPA accurately transcribed in its regulations, but AASA never adduced anything approaching persuasive evidence that schools could not comply with those deadlines. See Comments of AASA (Aug. 25, 1987), reprinted in J.A. 974. Hence, we see no reason to overturn EPA's decision not to amend its regulations.