**AUSABLE MANISTEE ACTION COUNCIL, INC., a Michigan Non–Profit Corporation; The Anglers of the Au Sable, Inc., a Michigan Non–Profit Corporation; The Au Sable North Branch Area Association, a Michigan Non–Profit Corporation; The Au Sable River System Property Owners Association, a Michigan Voluntary Association; County of Kalkaska, a Michigan County; Township of Garfield, a Michigan Township; Township of Lovells, a Michigan Township; The Michigan Council of Trout Unlimited, a Michigan Non–Profit Corporation, Plaintiffs,**

v.

**Major General E. Gordon STUMP, in His Official Capacity as Adjutant General of Michigan Department of Military Affairs; Gregory N. Huntington, in His Official Capacity as Environmental Manager of the Michigan Department of Military Affairs; Major General John R. D'Araujo, Jr., in His Official Capacity as Director of the Army National Guard; Lewis D. Walker, in His Official Capacity as Deputy Assistant Secretary of the**

Army; Michigan Department of Military Affairs, an Agency of the State of Michigan; National Guard Bureau, an Agency of the United States; and the United States Army, an Agency of the United States, Defendants.

No. 1:94–CV–500.

United States District Court,
W.D. Michigan,
Southern Division.

March 31, 1995.

Peter L. Gustafson, Warner, Norcross & Judd, Grand Rapids, MI, for plaintiffs.

George M. Elworth, Asst. Atty. Gen., Lansing, MI, Maria A. Iizuka, U.S. Dept. of Justice, Sacramento, CA, Michael L. Shiparski, Asst. U.S. Atty., Grand Rapids, MI, for defendants.

## OPINION

McKEAGUE, District Judge.

This case presents a challenge to the administrative decision of the United States Army, the National Guard Bureau, and the Michigan Department of Military Affairs (hereinafter collectively referred to as the "agency" or "defendants") to construct a Multi–Purpose Range Complex–Heavy–Reduced ("MPRC") at the Camp Grayling Army National Guard Training Facility. The specific legal basis for plaintiffs' challenge is their allegation that defendants have violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and its implementing regulations in two ways: the alleged failure to adequately consider certain environmental impacts in the Final Environmental Impact Statement ("FEIS"); and failure to supplement the Draft Environmental Impact Statement ("DEIS") when allegedly material changes occurred subsequent to issuance of the DEIS.

Now before the Court are the parties' cross-motions: plaintiffs ask the Court to declare defendants' actions violative of NEPA and enjoin construction of the MPRC at Camp Grayling until defendants fully comply with the statute and its regulations; defendants ask the Court to affirm the agency's compliance with NEPA and allow the agency to implement its decision.

### I

This case concerns the agency's decision to construct an MPRC at Camp Grayling, Michigan. The proposed site for the MPRC is at an existing tank range at Camp Grayling, specifically Range 30.[1] The proposed MPRC is designed to replace the World War II era tank and gunnery ranges presently in use at Camp Grayling. The agency's decision to build the MPRC is based on its conclusion

that it is necessary "to meet the current training needs of the units that currently train at Grayling." Federal defendants' brief in support, p. 5.[2]

Plaintiffs' initial complaint in this matter was filed on July 22, 1994.[3] On August 19, 1994, plaintiffs filed a motion for temporary restraining order (TRO) and preliminary injunction, requesting the Court to enjoin the letting of a contract for construction and the actual construction itself of the proposed MPRC at Camp Grayling. A conference call among all parties was initially conducted that same day, and was continued on Monday, August 22, 1994, at which time the state defendants assured plaintiffs' attorney that the contracting agent for this proposed project, DMA, would not enter into a contract for construction of the MPRC before a hearing was held on plaintiffs' motion for preliminary injunction. Based on that assurance, plaintiffs agreed not to pursue their TRO request, and that motion was formally denied by written order of the Court entered on August 23, 1994. The order also scheduled a hearing on September 22, 1994, to hear arguments on plaintiffs' motion for preliminary injunction.

At the September 22, 1994 hearing, the Court denied plaintiffs' preliminary injunction request from the bench. This denial subsequently was reduced to a written opinion that was filed on September 29, 1994.

The administrative record compiled during the decisionmaking process was filed with the Court on October 21, 1994. This record comprises 59 volumes totalling nearly 26,000 pages. The record also includes the DEIS, the FEIS, and the Record of Decision (ROD). On October 7, 1994, plaintiffs filed a request to submit additional evidence into the administrative record. In a written opinion and order filed on November 15, 1994,

---

1. See the diagram of current and planned ranges at Camp Grayling attached as Appendix A. This diagram is contained in the administrative record at Vol. 16, p. 7196.

 Throughout this opinion, citations to the administrative record are identified as AR, Vol. ——, p. ——.

2. See also the Record of Decision (ROD) wherein the agency explains that the proposed MPRC

facility "need[s] to be constructed, in accordance with the Installation Master Plan, to meet the needs of the military users of Camp Grayling and to protect the environment." ROD, p. 1.

3. By leave of the Court, plaintiffs amended their complaint on September 22, 1994, so as to include additional plaintiffs.

the Court denied plaintiffs' request to submit additional evidence. The Court found plaintiffs' proffer of additional evidence to be cumulative, untimely, or simply inappropriate, and generally unnecessary for determination of the adequacy of the agency's decision.

On November 23, 1994, defendants filed motions [4] seeking summary judgment of their compliance with NEPA and affirmance of the decision to build an MPRC at Camp Grayling. On December 2, 1994, plaintiffs filed their motion requesting summary judgment that the agency violated NEPA and enjoinment of any construction related to the MPRC until compliance is effected. Oral arguments on the cross-motions were heard on February 3, 1995, and the motions were taken under advisement.

At the hearing, the parties expressed their opinions that it would be advantageous for the Court to physically inspect an actual MPRC and the proposed construction site at Camp Grayling. Accordingly, on February 23, 1995, the Court observed a live training exercise at the MPRC at Ft. Knox, Kentucky. The Court then traveled to Camp Grayling, Michigan, and inspected the proposed construction site for the MPRC there. The Court's inspection at Camp Grayling was done both on the ground and from a helicopter.

The Court was accompanied on this inspection tour by attorneys for all parties, two of the named defendants, and two representatives from the plaintiff environmental groups. The inspection group received briefings at both facilities and had full access to site personnel for asking questions.

The Court considers the inspection to have been extremely useful in providing real-world context and understanding for its review of the agency decision being challenged in this case.

## II

■ Adjudication of this matter is controlled by NEPA, a statute that has a dual purpose: consideration by the agency of sig-

nificant aspects of the environmental impact of a proposed action, and assurance to the public that the agency "has indeed considered environmental concerns in its decision-making process." *Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 97, 103 S.Ct. 2246, 2252, 76 L.Ed.2d 437 (1983) (citations omitted). "NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350, 109 S.Ct. 1835, 1846, 104 L.Ed.2d 351 (1989) (citations omitted). The statute "merely prohibits uninformed—rather than unwise—agency action." *Id.* at 351, 109 S.Ct. at 1846. "Congress in enacting NEPA ... did not require agencies to elevate environmental concerns over other appropriate considerations. Rather, it required only that the agency take a 'hard look' at the environmental consequences before taking a major action." *Baltimore Gas & Elec.,* 462 U.S. at 97, 103 S.Ct. at 2252 (citations omitted).

> NEPA, unlike many environmental statutes, does not dictate agency policy or determine the fate of contemplated action. NEPA simply mandates a particular process that must be followed by a federal agency before taking action significantly affecting the human environment. After weighing environmental considerations, an agency decisionmaker remains free to subordinate the environmental concerns revealed in the EIS to other policy concerns.

*Environmental Defense Fund, Inc. v. Massey,* 986 F.2d 528, 532 (D.C.Cir.1993) (citations omitted).

When reviewing agency actions subject to NEPA, "[t]he role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Baltimore Gas & Elec.,* 462 U.S. at 97–98, 103 S.Ct. at 2252 (citation omitted). Under the "arbitrary or capricious" standard, "the reviewing court 'must consider whether the decision was based on a consideration of the relevant fac-

---

4. The federal defendants and state defendants have filed separate but parallel pleadings throughout this case.

tors and whether there has been a clear error of judgment.' This inquiry must 'be searching and careful,' but 'the ultimate standard of review is a narrow one.' " *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 1861, 104 L.Ed.2d 377 (1989) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971)). "In particular, judicial review of NEPA compliance is limited in scope." *Communities, Inc. v. Busey,* 956 F.2d 619, 623 (6th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 408, 121 L.Ed.2d 332 (1992).

■ It is generally accurate to say that an agency should apply a "rule of reason" when deciding whether to prepare a supplemental EIS, and "NEPA does require that agencies take a 'hard look' at the environmental effects of their planned action, even after a proposal has received initial approval." *Marsh,* 490 U.S. at 373–74, 109 S.Ct. at 1859. However, review of the narrow legal question whether the agency's decision not to issue a supplemental EIS violates NEPA is also controlled by the "arbitrary [or] capricious" standard of 5 U.S.C. § 706(2)(A). *Id.* at 376, 109 S.Ct. at 1860.

### III

As noted above, plaintiffs challenge the agency's actions in two ways. They allege that the FEIS in general fails to satisfy the requirements of NEPA[5] and its implementing regulations. In particular, they allege that the agency's refusal to issue a supplemental EIS violates NEPA because material changes had occurred in the period between issuance of the DEIS and the FEIS.

### A. DOES THE FEIS VIOLATE NEPA?

Plaintiffs claim that the FEIS "violates the fundamental precepts set down in the NEPA regulations," specifically 40 C.F.R. § 1502.1, which requires that an EIS "shall provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." Plaintiffs' brief in support, p. 1. According to plaintiffs, the FEIS "is grossly inadequate" and "fails even to consider the direct impacts which operation of the MPRC will have in contaminating land and water." Plaintiffs' brief in support, p. 21. The Court now considers each alleged inadequacy cited by plaintiffs.

### 1. Failure To Discuss Relevant Scientific Studies

■ Camp Grayling contains three main range complexes, only two of which are relevant to this discussion. The Range 40 Complex, located in the northernmost section of North Post, is the site of artillery, mortar, and air-to-ground firing exercises using explosive ordnance. The Range 30 Complex, located in the southernmost part of North Post, is the site of tank and infantry exercises using only non-explosive ordnance. AR, Vol. 16, p. 7196; FEIS, Fig. 3–14, p. 3–56. Range 30 is the proposed site for construction of the MPRC at Camp Grayling. The Range 40 impact area and the MPRC firing box are separated by a distance of approximately 10,000 meters (approximately 6.2 miles). FEIS, Fig. 3–14, p. 3–56.

In response to an investigation by the Michigan Department of Natural Resources ("DNR"), DMA negotiated a consent order

---

**5.** The relevant section of NEPA states:

The Congress authorizes and directs that, to the fullest extent possible: . . . . (2) all agencies of the Federal Government shall—
(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—
(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
(iii) alternatives to the proposed action,
(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should be implemented.
42 U.S.C. § 4332.

with DNR which required that a study be conducted at Range 40. The consent order also required that if contamination were found at Range 40, other ranges at Camp Grayling would be studied. All parties acknowledge that some contamination has been found at Range 40 and that DMA agreed to the listing of Range 30 as one of the subsequent sites of study.

The essence of this complaint is plaintiffs' assumption that the studies showing some soil and groundwater contamination at Range 40 are directly applicable to conditions at Range 30, the proposed site for the MPRC. Plaintiffs argue that the Range 40 studies "establish a substantial probability that the proposed site for the MPRC is contaminated with heavy metals and other toxic chemicals" and allege that the FEIS "fail[s] to disclose the chemical composition and toxicity of the propellants, munitions, and explosives that have been used on Range 30 over the past four decades." Plaintiffs' brief in support, pp. 38–39.

In response, defendants initially point out the differences in use between Range 40 and Range 30. Range 40 is an artillery range utilizing explosive rounds. Range 30, on the other hand, is a tank and gunnery range on which only non-explosive rounds are used. In addition, the Air National Guard utilizes the northernmost portion of the Range 40 impact area for training exercises involving live bomb drops. FEIS, § 3.9.2, pp. 3–222–223. Such activities have never been conducted on Range 30. Additional evidence refuting plaintiffs' assumption that the Range 40 studies directly apply to Range 30 is provided at AR, Vol. 57, p. 24339; Vol. 58, p. 24713.

Defendants also point out that the contamination found at Range 40 is mostly due to the former practice of disposing of excess artillery charge bags and unexploded shells. Disposal was effected by burning these waste products in "burn pits" or "burn pans." AR, Vol 58, p. 24714. These disposal practices never occurred on Range 30.

Other evidence that the agency considered the factors relevant to this issue is found at AR, Vol. 33, pp. 14278–79, 14282–87; Vol. 34–A, pp. 14629–720 (United States Army Environmental Hygiene Study of the Effects of Firing Activities at Range 40 on Water Quality).[6]

Plaintiffs' final point on this issue is that defendants have not adequately discussed the use of white phosphorus on Range 30. Plaintiffs' specific complaint is that white phosphorus is only discussed in the "noise abatement" section of the FEIS, but not in the sections on "wetlands, wildlife, fish, threatened and endangered species, or surface waters." Plaintiffs' brief in support, p. 39.

The Court's review of the FEIS leads it to conclude that plaintiffs simply misread that document. The FEIS states, in relevant part:

### 3.4.2.3.3 Noise Abatement Procedures

In consideration of local residents and recreational users of the Grayling area, the following noise abatement procedures have been established for use on the Range 30 and 40 complexes:

> * Tank maingun and artillery firing, 4.2–inch mortars (High Explosive & White Phosphorus), aircraft bombing and demolitions in excess of 2 pounds will begin no earlier than sunrise and cease no later that [sic] three (3) hours after sunset.

FEIS, p. 3–59. The only activity in this excerpt relative to Range 30 is "tank-maingun" activities. The reference to white phosphorus in this excerpt clearly relates only to the 4.2–inch mortars, weaponry never used or to be used on Range 30. This is subsequently made clear in the FEIS, in § 3.5.4.2.2 (titled Range 30 Complex), wherein it states that "[o]nly inert practice rounds are fired here." FEIS, p. 3–123.

The justification for the absence of discussion of white phosphorus in the FEIS sections cited by plaintiffs is defendants' testimony that white phosphorus has not been used at all since the Vietnam era, and that prior to that time the only such use on Range 30 was in "marker rounds" (or "tracer bul-

---

6. In Vols. 33 through 42, the Administrative Record contains exhaustive documentation of the studies and recommended remedial actions relevant to Range 40.

lets") which were used in 50–caliber tank guns. Defendants aver that the small amount of white phosphorus in these marker rounds is completely combusted before the round falls to the ground.

### 2. Failure To Discuss Scheduled Study of Range 30 And Planned Ordnance Use At MPRC

██ Plaintiffs allege that "the FEIS totally fails to address contamination from heavy metals and toxic chemicals that will result from operation of the MPRC." Plaintiffs' brief in support, p. 36. Plaintiffs also allege that "the FEIS woefully fails to disclose in fair detail the physical and chemical composition of the munitions that have been used on Range 30 and will be deployed on the MPRC." *Id.* at p. 37.

In regard to the planned ordnance use at the MPRC, defendants refer to Table 3–7 in the FEIS, which lists all weapons employed on the ranges currently used at Camp Grayling. FEIS, p. 3–58–59. Then, defendants point out that the proposed MPRC site "is currently devoted to tank range use and receives heavy training use," and that "[u]sage [of the MPRC] will be comparable to the existing use of the Range 30 complex." However, "ammunition allocations are anticipated to be reduced from recent distributions [because the planned MPRC] will allow for increased use of laser weapons simulators." And, as already noted, "[a]ll ammunition will be inert rounds." FEIS, p. 4–19.

Defendants also refute plaintiffs' claim on this point by noting that plaintiffs have consistently alleged that all types of weapons have been fired on Range 30 in the past. The Court's review of the record leads it to conclude that this allegation is unfounded.

As to the failure to discuss the scheduled study of Range 30, the Court cannot view it as arbitrary or capricious. Bearing in mind that plaintiffs' allegations of significant contamination at Range 30 are based on their erroneous assertion that the finding of some contamination at Range 40 is directly applicable to Range 30, defendants' decision not to delay construction of a necessary training facility cannot be considered uninformed.

Furthermore, plaintiffs' allegation that "Defendants have not cited to any consideration of the Range 30 contamination issue in the Administrative Record or otherwise," plaintiffs' reply brief, p. 5, is also patently untrue. See, e.g., federal defendants' brief in opposition, pp. 9–10 and n. 5; state defendants' brief in opposition, p. 10.

### 3. Failure To Adequately Address Mitigation Measures

██ Plaintiffs make the following claim: "The FEIS fails to evaluate any measures to mitigate the adverse impacts from contamination which will be caused by operation of the MPRC. Instead the FEIS merely states that there will be environmental monitoring of conditions at the Camp on a periodic basis. This analysis is clearly insufficient." Plaintiffs' brief in support, p. 47.

██ NEPA requires only "that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated," not that "a complete mitigation plan be actually formulated and adopted." *Robertson*, 490 U.S. at 352, 109 S.Ct. at 1847. "Even more significantly, it would be inconsistent with NEPA's reliance on procedural mechanisms—as opposed to substantive, result-based standards—to demand the presence of a fully developed plan that will mitigate environmental harm before an agency can act." *Id.* at 353, 109 S.Ct. at 1847.

The premise underlying plaintiffs' allegation of inadequacy is directly refuted by this caselaw. Furthermore, the Court's review of the record leads it to conclude that the comprehensive discussion of the issue of mitigation in the Administrative Record far exceeds the requirements of NEPA. See ROD, pp. 11–17; FEIS, § 2.3.3.5, pp. 2–13–14; § 4.1.2(b), p. 4–2. See, also, FEIS, pp. 4–17, 4.20, 4–26, 4–30, 4–35, 4–41–49, 4–52, 4–54, 4–56, 4–58, and 4–80.

### 4. Failure To Adequately Consider Cumulative Environmental Impacts

██ Plaintiffs claim that "[t]he FEIS does not discuss the cumulative impact of additional contamination which will be produced

through operation of the MPRC in conjunction with contamination from past firing range activities at Range 30." Plaintiffs' brief in support, p. 47. The Court has already concluded that plaintiffs' reliance on its mere assertion of contamination at Range 30 is unfounded. And defendants argue that the planned activities at the MPRC will not cause soil or groundwater contamination. More saliently, the FEIS again belies plaintiffs' allegation that the agency has failed to discuss a particular factor. The FEIS discusses and considers the cumulative impact on the following environmental areas: air quality (§ 4.1.2.4); noise (§ 4.1.3.5); soils (§ 4.1.4.4); surface water (§ 4.1.5.1.4 [streams] ); § 4.1.5.2.4 [lakes] ); groundwater (§ 4.1.6.4); wetlands (§ 4.1.7.4); vegetation (§ 4.2.1.4); threatened and endangered plant species (§ 4.2.3.4); wildlife (§ 4.2.4.4); fish (§ 4.2.5.4); threatened and endangered wildlife species (§ 4.2.6.4); land use (§ 4.3.1.4); archeological and historical resources (§ 4.3.2.4); recreation (§ 4.3.3.4); employment profile (§ 4.4.1.4); and the regional economy (§ 4.4.2.4).

### 5. Failure To Adequately Consider the Consequences Of Irretrievable Commitment of Resources And Costs Of Remediation

 Plaintiffs' allegation relies on the statement in the FEIS that the "impact zones associated with Range 13 and the Range 40 complex represent an irretrievable commitment of land use resources. The impact areas contain unexploded ordnance (duds) and therefore are unsafe for human access and use. Although it is technically feasible that these areas could be cleared, it is not realistic from an economic standpoint." Plaintiffs' brief in support, p. 49 (quoting FEIS, § 4.6, p. 4–77). From this statement, plaintiffs speculate that "[p]ortions of Range 30 may also be approaching irretrievable commitment." Once again, plaintiffs ignore the facts in the record.

There is no evidence in the record that explosive ordnance ever has been used at Range 30 or that explosive ordnance will be

used at the MPRC. And § 4.6 of the FEIS (titled "Irreversible and Irretrievable Commitment of Resources") contains discussion of this factor relative to soils, water resources, vegetation, fish and wildlife, threatened and endangered species, recreation, and even goes so far as to point out the obvious fact that "[p]ermanent facilities may be considered an irreversible commitment of resources." FEIS, § 4.6, pp. 4–76–78.

### 6. Failure To Adequately Consider Impact On Endangered And Threatened Species

As with all of plaintiffs' other allegations of inadequacy, this claim comes dangerously close to being frivolous under the standard established by NEPA. The Court has already referred to discussions in the record relative to threatened and endangered species in the context of cumulative impact and irretrievable commitment of resources. In addition, the Court notes the consideration and discussion of the effects on threatened and endangered species in §§ 3.6.1.4, 3.6.2.6, 4.2.3, 4.2.6, Appendix I (the United States Department of the Interior, Fish and Wildlife Service's "Biological Opinion For Construction And Operation Of Military Training Facilities At Camp Grayling, Michigan"), and Appendix O, pp. 0–7–8.

### 7. Failure To Address "Likely" Increase In Intensity Of Training

 The FEIS contains discussion of the expected levels of training at the MPRC on pages 1–11, 2–8, and 3–45.[7] This discussion alone belies plaintiffs' allegation that defendants have violated NEPA with regard to this factor. Additionally, however, the Court feels compelled to note that plaintiffs' assertion of a "likely increase" in training is apparently made out of whole cloth. The conclusion reached by the agency is that "training is not anticipated to increase at this time." FEIS, § 1.3, p. 1–11. Furthermore, defendants have expressed their intention to conduct additional environmental studies if, in the future, training levels increase at the MPRC. FEIS, § 1.3, p. 1–11.

---

7. The FEIS also contains tables specifying the expected levels of usage by all military groups

which will utilize the MPRC at Camp Grayling. FEIS, pp. 3–47, 3–48.

### 8. Failure To Consider Reasonable Alternatives

■ Plaintiffs' complaint in this regard is that defendants did not adequately consider the possibility of training at existing or planned MPRC facilities in other states. Once again, plaintiffs' complaint appears to be merely a disagreement with the agency's decision, rather than a plausible claim that defendants failed to comply with the procedural requirements of NEPA.

The FEIS contains a discussion of the alternative of training at an out-of-state MPRC. FEIS, § 2.4.3, pp. 2–15–16. The ROD explains that the alternative of training at an out-of-state MPRC "was not selected due to time and cost constraints" incurred by the necessity of having troops transport their equipment to the alternative site and back to Camp Grayling for each training cycle. This would not only significantly increase annual costs but, more importantly, "would also decrease actual field training time." ROD, p. 10.

■ The Court learned during its inspection tour that transportation of tanks and their related equipment must be done by rail.[8] In response to the Court's inquiry, personnel at Camp Grayling estimated it would take at least two days to transport all the necessary equipment to an out-of-state MPRC. This is a significant reduction in training time for the 115 units that participate in 14–day annual training periods. But to the 219 units that participate in two-day weekend training periods, these travel requirements are obviously prohibitive.[9] Defendants also explain that the MPRC at Camp Grayling is envisioned as an integral component of a national program for Army Reserve National Guard units which are expected to demonstrate proficiency on the type of range proposed for Camp Grayling and will require sufficient training time to develop the necessary skills. FEIS, App. O, p. O–34.

### 9. Conclusion

The Court's review of the record leads to the conclusion that the agency's decision clearly was based on a consideration of the relevant factors. The agency has taken a hard look at the environmental consequences of its proposed action and cannot be said to have made a clear error of judgment. Accordingly, the Court holds that the agency's ultimate decision to construct the MPRC at Camp Grayling was not arbitrary or capricious, and therefore complies with NEPA.

### B. DID THE AGENCY VIOLATE NEPA BY FAILING TO ISSUE A SUPPLEMENTAL EIS?

■ When it enacted NEPA, Congress also created the Council on Environmental Quality ("CEQ"). 42 U.S.C. § 4342. The CEQ regulation controlling this issue states, in relevant part:

Agencies:

(1) Shall prepare supplements to either draft or final environmental impact statements if:

 \* \* \* \* \* \*

(ii) there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

40 C.F.R. § 1502.9(c)(1)(ii). Therefore, to grant plaintiffs the relief they request on this basis, the Court must find that the agency ignored information that was both new and significant.

In their brief, plaintiffs purport to list 13 separate circumstances they allege are new and significant. It was readily apparent to the Court, and was readily conceded by plaintiffs at the hearing, that there is considerable overlap and repetition in the substance of these 13 listed circumstances. In fact, plaintiffs' original list is easily reducible

---

**8.** Technically, the information obtained by the Court during its inspection tour constitutes an expansion of the Administrative Record. However, such expansion is proper in this case because it provided the Court with "background information to aid the Court's understanding, or to determine if the agency examined all relevant

factors or adequately explained its decision." *United States v. Akzo Coatings of America, Inc.,* 949 F.2d 1409, 1428 (6th Cir.1991).

**9.** These figures are found in the FEIS, § 3.4, p. 3–45.

to a mere half-dozen. The Court now considers each of these six alleged "significant new circumstances" in turn.

### 1. Issuance Of Consent Order In 1991

 As already noted in § A.1, DMA negotiated a consent order with DNR which required that a study be conducted at Range 40. The consent order also required that if contamination were found at Range 40, other ranges at Camp Grayling would be studied. As also noted, some contamination has been found at Range 40. Defendants do not dispute this fact. Neither do defendants dispute that DMA agreed to the listing of Range 30 as one of the subsequent sites of study.

The Court has already concluded that the finding of contamination at Range 40 does not render the agency's proposed action at Range 30 violative of NEPA because of the well-documented differences between Range 40 and Range 30. These same differences make this "circumstance" insignificant for purposes of a supplemental EIS.

### 2. Listing Of Range 40 As An Act 307 Site

 Michigan P.A.1982, No. 307 ("Act 307"), codified at M.C.L. § 299.601 *et seq.* (the Michigan Environmental Response Act), governs the procedures for listing and scoring contamination sites in Michigan. Range 40 was listed as an Act 307 site in 1993. Plaintiffs claim that this circumstance requires supplementation of the EIS.

Again, the Court points to defendants' candid acknowledgement of the contamination at Range 40 and the well-documented differences between Range 40 and Range 30. The Court reaffirms its conclusion that defendants adequately considered the known contamination at Range 40 and the possible contamination at other sites in making their decision to construct an MPRC at Range 30.

### 3. Results Of The Range 40 Study

 Once again, plaintiffs assert that the finding of contamination at Range 40 is di-

rectly relevant to potential findings at Range 30.

The record shows that comments were received in response to the DEIS in regard to contamination at Camp Grayling, especially to surface waters and groundwater. See FEIS, App. O, p. 0–13, 0–22. Furthermore, plaintiffs' allegation that the finding of contamination at Range 40 is representative of the potential contamination at any firing range is belied by the Range 40 study itself.

Plaintiffs point to the contamination of Range 40 with trichloroethene and bis(2–ethylhexyl)phthalate. In fact, however, the study concluded that "phthalates do not appear to represent a significant concern at Range 40." FEIS, § 3.9.2, p. 3–224. Further, the trichloroethene and heavy metal contaminants found at Range 40 were found at the burn pit and burn pan sites. *Id.* at pp. 3–224–225. As already noted, disposal practices utilizing burn pits and burn pans were never conducted at Range 30.

The Court concludes that this "circumstance" is also inadequate to require a supplemental EIS.

### 4. The End Of The Cold War

 Plaintiffs point to the end of the Cold War and the consequent closing of numerous military bases throughout the United States. From these facts, plaintiffs speculate that military activities will be consolidated at the remaining bases, that this consolidation will include National Guard training facilities such as Camp Grayling, and that the availability of an MPRC facility at Camp Grayling will cause increased demand for training there with concomitant exacerbation of adverse environmental impacts. Plaintiffs' "parade of horribles" is implausible.

Defendants have already explained that U.S. Army Reserve National Guard troops are organized on a regional basis, with Camp Grayling being the designated MPRC site for the region which includes Michigan, Indiana and Ohio. The record also contains references to other existing and planned MPRC's.[10] Furthermore, the Court notes

---

**10.** In fact, plaintiffs expressly acknowledge these

additional existing or planned MPRCs. See

the obvious fact that the same economic and logistical factors that caused defendants to reject the alternative of training at an out-of-state MPRC weigh against Army Reserve National Guard units from other regions coming to train at Camp Grayling.

Additionally, in regard to the general issue of the role of the National Guard, the Court reaffirms its previous ruling that such matters are beyond the purview of the courts.[11]

### 5. Additional MPRC Facilities Are Or Will Be Available

As just discussed in § B.4, the agency adequately considered the alternative of training at another MPRC and rejected it as infeasible. See ROD, p. 10.

Additionally, the Court relies on information it acquired during its inspection tour of Ft. Knox, Kentucky, one of the allegedly feasible alternatives listed by plaintiffs.[12] The terrain of the MPRC firing lanes at Ft. Knox was flat and level for nearly the entire length of the range and there are no barriers between the various firing lanes. The terrain of the proposed construction site at Camp Grayling, however, consists of rolling hills, and the two firing lanes are separated by wooded hills. These significant differences belie any implication by plaintiffs that MPRCs are fungible for all training purposes. The Camp Grayling MPRC clearly will provide training on a particular terrain not available at Ft. Knox.

### 6. Population Increase In The Area Surrounding Camp Grayling

 Plaintiffs allege that during the period between issuance of the DEIS and the FEIS, "the population of the area surrounding Camp Grayling has grown significantly. An estimated 25% turnover has occurred in land ownership and residency during this period. New residents who will be directly affected by development of the MPRC should be given an opportunity [to] comment and participate in the NEPA process." Plaintiffs' brief in support, p. 21.

This quotation from plaintiffs' brief constitutes its entire argument as to this alleged significant new circumstance. The Court is unpersuaded.

 The record contains an ample amount of public comment in response to the DEIS,[13] and plaintiffs make no attempt to describe what comments these new residents would make that the former residents have not already made. For purposes of a supplemental EIS, population changes, without more, are neither significant nor new.

### 7. Conclusion

The Court has carefully reviewed the record and is satisfied that the agency has made a reasoned decision not to issue a supplemental EIS. It surely was not a clear error of judgment, and neither was it arbitrary or capricious.

Plaintiffs would have the Court substitute its judgment for that of the agency and evaluate environmental concerns over the considerations appropriate to defendants' governmental responsibilities. But substantive review of agency decisions is foreclosed to the courts under NEPA, and the per se primacy of environmental concerns is clearly not required by the statute. See *Baltimore Gas & Elec.*, 462 U.S. at 97, 103 S.Ct. at 2552. NEPA requires only that the agency consider all relevant factors, *Marsh*, 490 U.S. at 378, 109 S.Ct. at 1861, and the record before the Court evidences that the agency conducted a searching and careful inquiry before making the decisions challenged here.

For all the foregoing reasons, therefore, the Court holds that defendants' decision not to issue a supplemental EIS and their ultimate decision to proceed with construction of an MPRC at Camp Grayling were reached in

§ B.5.

11. This previous ruling was made in the Court's November 15, 1994 opinion and order denying plaintiffs' request to submit additional evidence.

12. In addition to Ft. Knox, plaintiffs list Ft. McCoy, Wisconsin; Ft. Drum, New York; Ft. Bragg, North Carolina; and Ft. Campbell, Kentucky.

13. "Approximately 600 comments were received during the public comment period." ROD, p. 4. See FEIS, App. O. See also FEIS, Apps. M and N.

compliance with the procedural requirements of NEPA.

An order consistent with this opinion shall issue forthwith.

## APPENDIX A

ORDER

In accordance with the Court's opinion of even date, defendants' motions (docket # s 103 and 104) are hereby GRANTED, and plaintiffs' motion (docket # 109) is hereby DENIED.

IT IS SO ORDERED.