**NATIVE VILLAGE OF POINT HOPE, et al., Plaintiffs,**

v.

**MINERALS MANAGEMENT SERVICE, et al., Defendants,**

and

**Shell Offshore Inc.; BP Exploration (Alaska) Inc., Intervenor–Defendants.**

**Case No. 1:08–cv–0011–RRB.**

United States District Court, D. Alaska.

July 2, 2008.

Mark Arthur Brown, U.S. Department of Justice, Washington, DC and David Glazer, U.S. Department of Justice, San Francisco, CA, for United States.

### ORDER ADDRESSING PENDING MOTIONS AND DISMISSING ACTION

RALPH R. BEISTLINE, District Judge.

## I. MOTIONS PRESENTED

Plaintiffs have filed, at Docket 1, a Complaint for Declaratory and Injunctive Relief challenging the decisions to issue permits to Shell Offshore, Inc., ("Shell") and BP Exploration (Alaska) ("BP") to authorize seismic surveys during the summer and fall of 2008 in the Chukchi and Beaufort Seas. The permits were issued by Defendants National Marine Fisheries Service ("NMFS") and Minerals Management Service ("MMS") under the Outer Continental Shelf Lands Act ("OCSLA").[1] Plaintiffs argue the issuance of the permits violates the National Environmental Policy Act ("NEPA")[2] and the Marine Mammal Protection Act ("MMPA"),[3] and seek review under the Administrative Procedure Act ("APA")[4].

Plaintiffs further allege that Defendants NMFS and Carlos Gutierrez have violated NEPA by issuing an incidental harassment authorization ("IHA") under the MMPA to authorize Shell and its contractor to "take" marine mammals during seismic surveys in the Chukchi and Beaufort Seas during 2008, prior to completion of a seismic programmatic environmental impact statement ("EIS").[5] Plaintiffs seek injunctive relief to ensure that Defendants comply with NEPA and MMPA, including requir-ing defendants to rescind any permits unlawfully issued.

In conjunction with their Complaint, Plaintiffs filed a Motion for Preliminary Injunction at Docket 5, seeking to halt seismic surveys scheduled for the summer/fall of 2008, pursuant to the permits that they argue were issued unlawfully. Defendants BP, Shell, MMS, Dirk Kempthorne, NMFS, and Carlos Gutierrez all have filed Oppositions to the Motion for Preliminary Injunction at Dockets 32, 38, and 40. In addition, the State of Alaska has moved to intervene in the matter as an interested party and also has filed an Opposition to the Motion for Preliminary Injunction at Docket 45. Plaintiffs have replied at Docket 49. BP filed a motion to accept a sur-reply, which Plaintiffs opposed. The Court then requested further briefing, which was filed at Dockets 63, 64, 65, and 66.

On 5/12/08, at Docket 26, this Court issued an Order granting expedited consideration, noting that "[n]o seismic surveys may be conducted until this matter has been resolved," thus maintaining the status quo until the Court could consider the Motion for a Preliminary Injunction. Oral argument has not been requested. Inasmuch as the Court concludes the parties have submitted memoranda thoroughly discussing the law and evidence in support of their positions, it further concludes oral argument is neither necessary nor war-

---

**1.** 43 U.S.C. §§ 1331 et seq. OCSLA establishes procedures for issuing mineral leases on the Outer Continental Shelf, which are implemented by MMS. The OCSLA authorizes MMS to issue geological and geophysical ("G & G") exploration permits for these and related purposes and requires that the data and information collected are obtained in a technically safe and environmentally sound manner. 30 C.F.R. §§ 251.4, 251.6.

**2.** 42 U.S.C. § 4321 et seq.

**3.** 16 U.S.C. § 1361.

**4.** 5 U.S.C. §§ 701–706.

**5.** The "taking" of marine mammals under the MMPA means "to harass, hunt, capture or kill, or attempt to harass, hunt, capture, or kill any marine mammal." 16 U.S.C. § 1362(13); 50 C.F.R. § 216.3.

ranted with regard to the instant matter.[6]

## II. BACKGROUND

Two types of federal agency authorizations are at issue in this case: (1) Geological and Geophysical ("G & G") seismic survey permits issued by the MMS under OCSLA; and (2) an Incidental Harassment Authorization ("IHA") issued by NMFS under MMPA. Both types of permits are required prior to conducting seismic survey operations.

Plaintiffs seek to prevent these seismic surveys, the noise from which, they allege, can disrupt important marine mammal behaviors such as feeding, breathing, communicating, and social bonding, and can cause temporary or permanent hearing loss in those mammals. Plaintiffs allege that a single survey may harm tens of thousands of marine mammals. In turn, the damage to the marine mammals may have an indirect adverse effect on the villages that rely on these animals as a subsistence resource.[7] Defendants argue that seismic surveying activities do not cause significant or permanent harm or injury to marine mammals or their habitat, and that this Court should defer to the expertise of the agencies who approved the permits.

### National Environmental Policy Act—NEPA

NEPA mandates the preparation of an Environmental Impact Statement ("EIS") for any major federal action "significantly affecting the quality of the human environment." [8] The twin objectives of NEPA are to (1) require the federal agency to "consider every significant aspect of the environmental impact of a proposed action," and (2) ensure that the agency "inform[s] the public that it has indeed considered environmental concerns in its decisionmaking process." [9] The agency, however, is not required to elevate environmental concerns over other appropriate considerations.[10]

A threshold question in a NEPA case, therefore, is whether a proposed project will "significantly affect" the environment and trigger the requirement for preparing an EIS.[11] An agency may prepare a less rigorous environmental assessment ("EA") to determine whether the environmental impact of a proposed action is significant enough to warrant preparation of an EIS.[12] If the agency determines that an EIS is not necessary, it will issue a Finding of No Significant Impact ("FONSI").[13]

If an agency has previously prepared an EIS, it may prepare an EA to determine whether new information or circumstances not originally accounted for in the EIS require preparation of an updated EIS. "The new circumstance must present a seriously different picture of the environmental impact of the proposed project

---

6. See Mahon v. Credit Bureau of Placer County Inc., 171 F.3d 1197, 1200 (9th Cir.1999)(explaining that if the parties provided the district court with complete memoranda of the law and evidence in support of their positions, ordinarily oral argument would not be required).

7. Docket 5.

8. 42 U.S.C. § 4332(2)(C).

9. Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87, 97, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983)(internal citations omitted).

10. Id.

11. Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208, 1212 (9th Cir. 1998) (citing 42 U.S.C. § 4332(2)(C)).

12. Id. (citing 40 C.F.R. § 1508.9).

13. Metcalf v. Daley, 214 F.3d 1135, 1143 (9th Cir.2000) (citing 40 C.F.R. § 1508.9).

from what was previously envisioned."[14] Based upon the EA, the agency may prepare a supplemental EIS or, alternatively, conclude that there are no "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."[15] An agency need not "release and circulate a formal supplemental EIS, or a formal document explaining why the agency believes a supplemental EIS is unnecessary, every time some new information comes to light. Rather, a reasonableness standard governs."[16]

In this case, it has already been determined that an EIS will be prepared. However, before completion of the EIS, permits were issued allowing seismic surveys to proceed and authorizing incidental harassment in the summer and fall of 2008. The issue presented concerns whether NMFS and MMS violated NEPA by authorizing seismic surveys and incidental harassment before completing the EIS currently underway to evaluate the impacts of, and alternatives to, the entire seismic survey program for the Beaufort and Chukchi Seas.[17] Plaintiffs argue that the failure to complete the EIS prior to the issuance of permits was an error on the part of the administrative agencies, reviewable by this Court under the Administrative Procedure Act. Defendants argue that completion of the EIS was not required before the permits were issued, because the EIS is being voluntarily prepared based on hypothetical events that may occur in the future.

## III.  STANDARD OF REVIEW

### A.  Preliminary Injunction

The Ninth Circuit has recognized that there are two standards for preliminary injunctive relief—the "traditional" standard and the "alternative" standard.[18] The traditional standard requires a plaintiff to show:

1.  a strong likelihood of success on the merits,

2.  the possibility of irreparable injury to plaintiff if preliminary relief is not granted,

3.  a balance of hardships favoring the plaintiff, and

4.  advancement of the public interest (in certain cases).

The alternative test requires that a plaintiff demonstrate either (1) a combination of probable success on the merits *and* the possibility of irreparable injury, **or** (2) that serious questions are raised *and* the balance of hardships tips sharply in the movant's favor. "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases. They are not separate tests but rather outer reaches of a single continuum."[19]

### B.  Judicial Review of Agency Action

■ Judicial review of administrative actions under NEPA is governed by the

---

**14.**  *See Or. Natural Res. Council v. Devlin*, 776 F.Supp. 1440, 1449 (D.Or.1991) (citing *Sierra Club v. Froehlke*, 816 F.2d 205, 210 (5th Cir. 1987)).

**15.**  40 C.F.R. § 1502.9(c)(1).

**16.**  *Friends of River v. Fed. Energy Regulatory Comm'n*, 720 F.2d 93, 109 (D.C.Cir.1983).

**17.**  See 40 C.F.R. § 1506.1.

**18.**  *Earth Island Inst. v. United States Forest Service*, 351 F.3d 1291, 1298 (9th Cir.2003).

**19.**  *Taylor v. Westly*, 488 F.3d 1197, 1200 (9th Cir.2007).

Administrative Procedure Act ("APA").[20] Under the APA, the Court must determine whether the agency action was "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law,"[21] or "without observance of procedure required by law...."[22] When considering whether the action was arbitrary and capricious or an abuse of discretion, "we must ensure that the agency has taken a 'hard look' at the environmental consequences of its proposed action."[23] However, "[t]he standard is narrow and the reviewing court may not substitute its judgment for that of the agency."[24]

## IV. DISCUSSION

This Court is no stranger to the issue of oil and gas leasing and exploration in the Chukchi and Beaufort Seas.[25] The Court previously has held that the Beaufort Sea incidental take rule and/or regulations complied with *all* aspects of the MMPA.[26] The Court also has declined to invalidate specific lease sales or to require MMS to prepare a supplemental EIS regarding those sales.[27]

■ The Ninth Circuit has held that a decision of whether to create or supplement an EIS is "a classic example of a factual dispute the resolution of which implicates substantial agency expertise."[28]

NEPA requires that the agency take a "hard look" at the new information to determine whether supplementation of the EIS is necessary.[29] Where "a court reviews an agency action involv[ing] primarily issues of fact, and where analysis of the relevant documents requires a high level of technical expertise, [the court] must defer to the informed discretion of the responsible federal agencies."[30]

In this case, however, Plaintiffs complain that Defendants found that an EIS *was* necessary, but then failed to complete it before issuing the permits. **The threshold question,** therefore, is whether it was unlawful for the agencies to issue permits prior to the completion of the EIS.

## A. Applicability of 40 C.F.R. § 1506.1(c)

The relevant federal regulation provides: While work on a *required* program environmental impact statement is in progress and the action is not covered by an existing program statement, agencies shall not undertake in the interim *any major Federal action* covered by the program which may *significantly affect the quality of the human environment* unless such action:

---

**20.** 5 U.S.C. §§ 701–706.

**21.** 5 U.S.C. § 706(2)(A).

**22.** 5 U.S.C. § 706(2)(D).

**23.** *Blue Mountains Biodiversity Project,* 161 F.3d at 1211.

**24.** *Envtl. Def. Ctr. v. EPA,* 344 F.3d 832, 858 n. 36 (9th Cir.2003) (citing *Marsh v. Or. Natural Res. Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989)).

**25.** *See* Plaintiffs' Notice of Related Cases at Docket 10.

**26.** *Center for Biological Diversity and Pacific Environment v. Hempthorne, et al.,* 3:07–cv–141 RRB, Docket 91 at 8.

**27.** *North Slope Borough and Alaska Eskimo Whaling Commission v. Minerals Management Service, et al.,* 3:07–cv–45 RRB, Docket 59.

**28.** *Headwaters, Inc. v. BLM,* 914 F.2d 1174, 1177 (9th Cir.1990) (citing *Marsh v. Or. Nat. Resources Council,* 490 U.S. 360, 374, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989)).

**29.** *Id.*

**30.** *City of Sausalito v. O'Neill,* 386 F.3d 1186, 1206 (9th cir.2004).

(1) Is justified independently of the program;

(2) Is itself accompanied by an adequate environmental impact statement; and

(3) Will not prejudice the ultimate decision on the program. Interim action prejudices the ultimate decision on the program when it tends to determine subsequent development or limit alternatives.[31]

Plaintiffs argue that MMS and NMFS violated NEPA by authorizing seismic surveys before completing the EIS, asserting that the agencies' decision to prepare an EIS covering future projects shows, by implication, that the 2008 seismic survey program will cause a significant impact on the human environment. They suggest the number of surveys anticipated for 2008 exceeds the number of surveys considered in any recent EAs, and that the EAs prepared by the agencies do not identify all of the surveys anticipated for 2008, let alone evaluate the combined effects of these surveys or explain why the effects will not rise to a level of significance.[32]

Defendants rationalize that because MMS and NMFS conducted extensive environmental analyses and both made Findings of No Significant Impact ("FONSI"), and determined that the seismic surveying in the 2008 open-water season will not significantly affect the human environment, MMS and NMFS are not bound by the requirements of 40 C.F.R. § 1506.1(c). They argue that the seismic surveys are neither a "major federal action" nor will they cause a "significant impact" on the environment, and therefore do not trigger the restrictions of section 1506.1(c). They maintain that the issuance of the permits following a FONSI, even when an EIS is pending, is entirely appropriate, citing *Intertribal Bison Co-op v. Babbitt.*[33]

Defendants further argue that even if the activities here are considered major federal actions, they already have been separately analyzed within the context of one or more previously performed EISs, and therefore fall into the exception language of § 1506.1, noting that the 2003 Multi–Sale and 2007 Sale 193 EISs addressed seismic activities at a comparable scale, and therefore satisfy the requirements of the exception.[34]

Finally, Defendants argue that NEPA regulations distinguish between *broad* EISs, which may be used to evaluate effects resulting from implementation of regulations, policies, or programs, and *project specific EISs* tailored for individual per-

**31.** 40 C.F.R. § 1506.1(c)(emphasis added).

**32.** For example, Plaintiffs complain that none of the EAs fully adopts the 120–dB and 160–dB safety zones deemed necessary to avoid significant impacts in 2006, when fewer surveys were conducted, nor even discuss the need for such measures in light of the greater level of activity anticipated in 2008.

**33.** 25 F.Supp.2d 1135, 1139 (D.Mont.1998). In *Intertribal Bison*, the plaintiffs argued that the National Parks Service violated NEPA by allowing federal action under an "Interim Plan" for managing migrating bison. There, plaintiffs pointed to a draft EIS which was being prepared for a long-range bison management plan, and argued that no action should be permitted under the Interim Plan until the EIS was completed. The court reasoned that "this argument might be valid but for the fact that [the agency] issued a FONSI that defined the 1996 Interim Plan not to be a major federal action significantly affecting the quality of the human environment." Because the agency had completed an environmental assessment and issued a FONSI, the court concluded that 40 C.F.R. § 1506.1(c) did not apply to the 1996 Interim Plan.

**34.** The 2003 Multi–Sale EIS analyzes proposed seismic activities in the Beaufort Sea for Lease Sales 186, 195, and 202, while the 2007 Lease Sale 193 EIS covers similar activities in the Chukchi Sea.

mits that will have significant impacts. In this case, the ongoing seismic EIS resulted not from an EA, but began as an EIS to meet the joint, long-range planning needs of both MMS and NMFS. MMS decided to conduct both a EIS to evaluate potential effects resulting from any future regulatory decision to authorize up to 12 seismic surveys in any one season, in addition to project specific EAs evaluating the effects from individual G & G permits. MMS' decision to issue an EIS was not triggered by a concrete proposed action of any kind. Rather the EIS analyzes an anticipated increased level of seismic activity *expected in the future,* which is greater than the level of activity analyzed in the NEPA documents specific to the 2008 seismic activities at issue in this case. Defendants contend that at no point since 2006 has MMS actually issued up to eight G & G permits contemplated in the 2006 EA, and that the current number of permits issued or proposed to be issued for the 2008 season remains well below the eight simultaneously evaluated in the 2006 PEA and are thus within its scope.

■ The Court agrees that the decision to prepare a Programmatic EIS on a hypothetical future level of seismic activity in the Arctic Ocean does not undermine the Agencies' issuance of the EAs/FONSIs for the specific activities in this case. Accordingly, the Court finds it is consistent with NEPA's implementing regulations for the agencies to have issued EAs for the three G & G permits and one IHA in question,

notwithstanding the determination to conduct an EIS covering an anticipated increase in the level of seismic activity in the future.

## B. Injunction

Having concluded that the agencies did not commit a procedural error by issuing permits prior to the completion of the EIS, the Court now considers whether the actions were "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." [35] An agency decision is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." [36]

The parties agree that no further briefing is necessary to decide the underlying request for a declaratory judgment. Accordingly, the Court really must determine whether to issue a permanent injunction, rather than a preliminary injunction. In order to obtain a permanent injunction, Plaintiffs must demonstrate "actual success" rather than only a "likelihood of success" on the merits.[37]

The Ninth Circuit has held that harm to marine mammals from underwater noise constitutes a sufficient basis for issuing preliminary injunctive relief.[38] But the

**35.** 5 U.S.C. 706(2)(A).

**36.** *Pac. Coast Fed'n of Fishermen's Ass'ns, Inc. v. Nat'l Marine Fisheries Serv.,* 265 F.3d 1028, 1034 (9th Cir.2001) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)).

**37.** See *Sierra Club v. Penfold,* 857 F.2d 1307, 1318 (9th Cir.1988) ("The standard for a pre-

liminary injunction is essentially the same as for a permanent injunction except 'likelihood of success on the merits rather than actual success' must be shown.")

**38.** *See Natural Res. Def. Council v. Winter,* 518 F.3d 658, 696–97 (9th Cir.2008) cert. granted —— U.S. ——, 128 S.Ct. 2964, —— L.Ed.2d —— (2008); *See also Ocean Mammal*

Defendants argue that there is no evidence that the seismic surveys will result in any effects other than, at most, short-term changes in behavior by a very small number of marine mammals. There is extensive briefing regarding the meaning of the term "small numbers." Defendants further argue that although NEPA documents detail potential adverse effects, MMS and NMFS have "taken the requisite 'hard look' and, in doing so, have candidly identified potential adverse impacts." Despite any such findings, the agencies have found that "as mitigated, no significant adverse impacts, individually or cumulatively, are reasonably likely to occur." Defendants argue that Plaintiffs ignore the mitigation measures that are in place, and ignore all of the history of seismic surveying activities as well as the studies that demonstrate the effectiveness of such mitigation measures.

"[E]ven in the context of environmental litigation, we apply the traditional balance of harms analysis." [39] "Environmental injury, by its nature, can seldom adequately be remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. If such injury is sufficiently likely, therefore, the balance of the harms will usually favor the issuance of an injunction to protect the environment." [40] But Defendants argue there are other clear and important competing interests. Oil and gas activities in the Alaska OCS require many years of effort, very long lead times, enormous investment costs, and can only be conducted during

limited months of each year. An injunction in this instance, they say, would result in an immediate financial loss of approximately $17 million by BP Alaska. And the State complains that an injunction would cause immediate and substantial harm because it would delay or preclude future development, and would result in the loss of production and income tax revenue, royalties and an increase in Trans–Alaska Pipeline tariff rate. Furthermore, it would adversely affect "the State's statutory and regulatory duties in responsibly managing development of the State's natural resources."

With respect to the public interest, "Congress' overriding purpose in enacting the MMPA was the protection of marine mammals." [41] NEPA aims to "promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man ...." 42 U.S.C. § 4321. An injunction that prevents harmful activities undoubtedly furthers these purposes and thereby protects the public interest. But the potential harm to the environment is not the only public interest at issue. As discussed above, the development of the state's natural resources is a competing public interest to consider.

■ As long as the agency "has considered the relevant factors and articulated a rational connection between the facts found and the choice made," a court must uphold the administrative action.[42] Deference is especially appropriate when re-

---

*Inst. v. Gates,* 546 F.Supp.2d 960, 982–84 (D.Hawai'i 2008).

**39.** *Nat'l Parks & Conservation Assn. v. Babbitt,* 241 F.3d 722, 737(9th Cir.2001) (internal quotation omitted).

**40.** *Amoco Prod. Co. v. Vill. of Gambell,* 480 U.S. 531, 545, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987).

**41.** *Balelo v. Baldrige,* 724 F.2d 753, 756 (9th Cir.1984).

**42.** *Baltimore Gas & Elec. Co.,* 462 U.S. at 105, 103 S.Ct. 2246.

viewing the agency's technical analysis and judgments involving the evaluation of complex scientific data within the agency's technical expertise.[43] Deference must be given to the experience and expertise of the agency in light of the Supreme Court's instruction that the Court is not to substitute its own judgment for that of the agency.[44] Furthermore, the purpose of NEPA is to ensure that environmental considerations are taken into account, but not necessarily elevated over other appropriate considerations.[45]

■ The Court finds no violations of NEPA or the MMPA in the instant case. Defendants have voluntarily begun the process of an EIS based on hypothetical projections of future increased seismic survey activity. This does not mean that all seismic survey activity must immediately grind to a halt. A certain degree of seismic activity has historically been approved, and the Court is not persuaded that all seismic activity should be precluded until the voluntary EIS is completed.[46]

As the Court previously found in related cases, the balance of hardships weighs in favor of Defendants who have invested significant time and expense in preparing for the scheduled activities.[47] Moreover, the public interest in energy development favors upholding the permits. To conclude otherwise would require the Court to engage in multiple levels of speculation regarding animal migration and economics, and to conclude that existing federal regulations would not effectively address Plaintiffs' environmental concerns.

As the Supreme Court observed in the discussion of nuclear power as a source of energy:

> Much of the debate focuses on whether development of nuclear generation facilities should proceed in the face of uncertainties about their long-term effects on the environment. Resolution of these fundamental policy questions lies, however, with Congress and the agencies to which Congress has delegated authority, as well as with state legislatures and, ultimately, the populace as a whole. Congress has assigned the courts only the limited, albeit important, task of reviewing agency action to determine whether the agency conformed with controlling statutes.[48]

The Court's only role here is to determine if the agency action was "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." For the foregoing reasons, the Court finds no legal fault with the agency action in this instance.

## V. CONCLUSION

In light of the foregoing, the State's Motion to Intervene at **Docket 43** is **GRANTED.** BP's Motion to File Sur–Reply at **Docket 52** is **GRANTED.** Plaintiffs' Motion for a Preliminary Injunction at **Docket 5** is **DENIED.** Plaintiff's Com-

---

**43.** *Oregon Natural Resources Council Fund v. Brong,* 492 F.3d 1120, 1135 (9th Cir.2007).

**44.** *Envtl. Def. Ctr. v. EPA,* 344 F.3d 832, 858 n. 36 (9th Cir.2003).

**45.** *Baltimore Gas & Elec. Co.,* 462 U.S. at 97, 103 S.Ct. 2246.

**46.** See *Babbitt,* 241 F.3d at 729. The remedy in *Babbitt* involved limiting an increase of

cruise ships in Glacier Bay until an EIS was completed. The Court continued to allow vessel traffic that was consistent with the existing regulations, as established prior to the issuance of the EA.

**47.** *See* 3:07–cv–45 RRB, Docket 25 at 12; Docket 59 at 12.

**48.** *Baltimore Gas and Elec. Co.,* 462 U.S. at 97, 103 S.Ct. 2246.

plaint for Declaratory Relief at Docket 1 is **DENIED.** This matter is **DISMISSED.**

**IT IS SO ORDERED.**